IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

|  |  |  |
|---|---|---|
| IN RE | ) | |
| L&D INTERESTS, INC., | ) | CASE NO. 03-81176-G3-7 |
| Debtor, | ) | |
| ROBBYE R. WALDRON, TRUSTEE, | ) | |
| Plaintiff, | ) | |
| v. | ) | ADV. NO. 05-8064 |
| MOODY NATIONAL BANK, | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

The court has held a trial in the above captioned
adversary proceeding.  The following are the Findings of Fact and
Conclusions of Law of the court.  A separate conforming Judgment
will be entered.  To the extent any of the Findings of Fact are
considered Conclusions of Law, they are adopted as such.  To the
extent any of the Conclusions of Law are considered Findings of
Fact, they are adopted as such.

In the instant adversary proceeding, the Chapter 7
Trustee ("Trustee") seeks avoidance of sixty-two transfers paid
by Moody National Bank ("Moody") out of the bank account of L & D
Interests, Inc. ("Debtor") between August 29, 2003 and September
23, 2003.  Trustee asserts that the transfers were fraudulent
conveyances under Section 548(a)(1)(A) or Section 548(a)(1)(B)(i)

of the Bankruptcy Code, which may be recovered from Moody as an
immediate transferee under Section 550 of the Bankruptcy Code.
Alternatively, Trustee states a cause of action for damages based
on Moody's alleged negligence.  Trustee asserts that the total of
funds debited from Debtor's account, $367,645.23, is the measure
of recovery under either of the fraudulent transfer or negligence
theories.

Findings of Fact

On September 19, 2003, Allied Houston Bank,
Conmaco/Rector, L.P., and Minnwest Bank Central filed an
involuntary petition under Chapter 7 of the Bankruptcy Code
against Debtor.  On October 6, 2003, the court ordered that an
interim trustee be appointed.  Robbye R. Waldron was appointed as
interim trustee.  An order for relief was entered on November 20,
2003, and Waldron remained as the Chapter 7 Trustee.

Larry Michael Nixon, the president and owner of Debtor,
opened a bank account for Debtor at Moody on August 27, 2001.
The initial persons whose signatures were authorized on the
account were Nixon, listed as Debtor's president, and Heather
Hopkins, listed as Debtor's office manager.  Nixon also signed a
corporate resolution, on a form provided by Moody, listing
himself as secretary of Debtor, and authorizing himself to
exercise all of the powers associated with the account.  Hopkins
also signed the form.  Neither the initial signature card nor the

2

initial corporate resolution was notarized.  (Trustee's Exhibit 2).

Hopkins testified that, between August 27, 2001 and August 27, 2003, she wrote checks on Debtor's account at Moody, at Nixon's direction.  She testified that Nixon also wrote checks on Debtor's account.  Hopkins testified that Debtor was in the business of buying and selling construction cranes.

On either May 6, 2003 or June 6, 2003, Nixon revised the signature card to add Elizabeth Reeder[1] as a person whose signature was authorized on the account.  (Trustee's Exhibit 75).  Reeder, who was Nixon's former spouse, testified that she was not a director, officer, or employee of Debtor.  At the same time the signature card was revised, Nixon, Hopkins, and Reeder signed a revised corporate resolution, on a form provided by Moody, identifying Nixon as the secretary of Debtor, and listing Nixon, Hopkins, and Reeder as persons authorized to exercise all of the powers associated with the account.  The revised form of corporate resolution identifies Nixon as president and Hopkins as office manager.  The revised corporate resolution does not list a position for Reeder.  (Trustee's Exhibit 76).

Emily Balderas, who was then the assistant branch manager at Moody's Clear Lake branch, testified that she

---

[1]The evidence in this case concerns Elizabeth Reeder and Brad Reeder, the husband of Elizabeth Reeder.  All references to "Reeder" alone refer to Elizabeth Reeder.  Brad Reeder is referred to as "Brad Reeder."

3

notarized the revised corporate resolution.  She testified that, at the time when she notarized the revised corporate resolution, she had recently been promoted to the position of assistant branch manager, and was in training on how to handle such matters.  She testified that she notarized the revised corporate resolution "because that was what Mike [Nixon] was agreeing to."

Nixon disappeared on August 27, 2003.  News reports indicated that Nixon's speedboat had crashed in the Houston Ship Channel, and that neither Nixon nor his body had been found. Nixon was later found alive, and was apprehended by United States Marshals on January 9, 2004.

Trustee and Moody have stipulated that Debtor was insolvent from August 27, 2003, the date on which Nixon disappeared, through November 20, 2003, the date on which an order for relief was entered.  (Docket No. 35).  Moody has filed a proof of claim in Debtor's Chapter 7 case, asserting a claim in the amount of $168,099.70, based on Debtor's guaranty of notes made by Nixon and secured by Nixon's speedboat, a vehicle, and deposit accounts.

Several employees of Moody at its Clear Lake branch, including Balderas, Michael Hazelwood, who was then a commercial loan officer and vice president, and Michele Rutherford, who was Hazelwood's assistant, testified that, on the morning of August 28, 2003, the day after Nixon's disappearance, they were aware of

4

the news reports surrounding Nixon's disappearance.

On August 28, 2003, Reeder entered Moody's Clear Lake branch, and requested to withdraw all the funds in Debtor's account.  On August 28, 2003, the balance in Debtor's account was $594,271.95.  (Trustee's Exhibit 11).

Reeder's request was directed to Hazelwood.  Hazelwood testified that he discussed Reeder's request with Balderas.  Balderas testified that, because the branch manager, Sylvia Montalvo, was not present in the office, Balderas and Hazelwood jointly decided to contact Moody's senior management.

Balderas initiated a telephone call to Michael Christiansen, Moody's executive vice president and chief administrative officer.  Christiansen then conferred with Moody's counsel, and initiated a conference call with Balderas and Hazelwood.

Christiansen testified that he made a decision "that we would go forward, allowing the corporation to do its business. We did not see a compelling reason to shut down the corporation by freezing its account, nor did I believe the right and prudent thing to do would be to allow any individual to drain the account or take a large bonus from the corporation that would have been completely out of the realm of normalcy."

After the conference call, Balderas refused to allow Reeder to withdraw the funds in Debtor's account.  She told

5

Reeder that Moody's counsel would contact Reeder's counsel
(though Balderas admits that she did not know whether Reeder or
Debtor was represented by counsel).

Balderas testified that, after August 28, 2003, it was
her understanding that all transfers from Debtor's account
required Christiansen's approval.  She testified that she placed
an instruction on the account noting that no transfers from the
account were to be made, and directing that either Balderas or
Montalvo be contacted if an attempt was made to transfer funds
from the account.  Christiansen testified that he had not
instructed that all transfers required his approval.  He
testified that his instruction was that funds should not be
transferred from the account to an individual, in a large amount.

Between August 29, 2003 and September 23, 2003, eighty-
one debits to Debtor's account were presented to Moody.  These
debits include fourteen checks signed by Nixon (of which eight
were paid by Moody), sixty-one checks signed by Reeder (of which
forty-eight were paid by Moody) two wire transfers, and four
debits for fees paid to Moody.  Between August 29, 2003 and
September 23, 2003, Moody transferred $367,645.23 out of Debtor's
account in payment of the approved debits, leaving a balance of
$226,626.72. (Trustee's Exhibit 10).

The two wire transfers were the largest debits against
the account between August 29, 2003 and September 23, 2003.  On

6

September 5, 2003, Moody paid a wire transfer, in the amount of $75,298.00, from Debtor's account to Blake D. Aldridge, Inc. dba Texas Tires.  The transfer was requested on a form prepared by Rutherford, signed by Reeder, and approved by Balderas and Christiansen.  On September 11, 2003, Moody paid a wire transfer, in the amount of $210,000, from Debtor's account to Hobbs Trailer & Equipment, Inc.  The transfer was requested on a form prepared by Rutherford, and signed by Reeder.  The form states that "approval will come from Mike Christiansen."  (Trustee's Exhibit 44).

Trustee and Moody have stipulated that payment was stopped as to nineteen of the debits.  The parties are not in agreement as to how the payments were stopped.  Rutherford testified that Reeder requested that she stop payment on several items.  She testified that stop payment forms were filled out for each payment stopped.  She testified that the forms are maintained by Moody "behind the teller line" in the bank branch office.  Reeder testified that she has no recollection of having requested that payments from the account be stopped.  Balderas testified that Reeder and Rutherford went through the outstanding checks together on August 28, 2003, in order to determine which checks to stop.  She testified that a stop payment on Debtor's account could not have been processed without approval from senior management.  She testified that every stop payment

7

required that a stop payment form be filled out.  Christiansen testified that he has not seen any stop payment forms for the account.  No stop payment forms were offered as evidence in the instant adversary proceeding.

The court finds that Balderas' testimony is the most credible regarding Christiansen's instructions for treatment of the account, and as to the manner in which stop payments were handled.  The court finds that Christiansen instructed that all transfers from Debtor's account required Christiansen's approval.  The court finds that Christiansen personally approved all the payments that cleared, and all the stop payments, on Debtor's account.

On August 29, 2003, two days after Nixon's disappearance, Hopkins wrote to Moody, instructing that checks numbered 2715, 2732, 2733, 2734, 2735, 2736, and 2737 "need to be cleared."  The letter provides: "Please do not clear any other checks without verbal or written authorization at this time." (Trustee's Exhibit 38, at p. Marlin/MNB 007798).[2]  On the same date, Rutherford signed a memorandum stating that Hopkins had advised that she would no longer sign checks.  (Trustee's Exhibit 38).

---

[2]Hopkins' instructions also addressed Check No. 2725.  It was not among the eighty-one transfers presented between August 29, 2003 and September 23, 2003, having already been paid on August 28, 2003.  (Trustee's Exhibit 11).

Hopkins testified that, in the immediate aftermath of Nixon's disappearance, Scott Williams, (who testified that he was Nixon's attorney in Nixon's individual capacity), directed which bills were to be paid, and which checks should be stopped. She testified that she prepared the letter of August 29, 2003 at Williams' direction.

Williams testified that he did not instruct anyone to stop payments on any checks on Debtor's account. He testified that he instructed his assistant to send a letter to Moody, informing the bank that he was named as executor of Nixon's probate estate, and directing the bank to freeze the account.

Moody's attorneys responded to Williams' letter, by letter dated August 29, 2003, stating with respect to Debtor's account,[3] that "the Bank has a depository agreement with a viable corporate customer. The Bank is bound to comply with the depository agreement and intends to honor payable items presented to the Bank in the normal course of business, including those items that were written on the account for what would appear to be normal business expenses prior to Mr. Nixon's accident, the payroll issued today, and the Bank will be watchful for any additional items for such normal business expenses that may be subsequently written if the Bank is requested to process same."

---

[3]Nixon had also had a personal account at Moody National Bank. At the time of Nixon's disappearance, the account had been garnished by Production Finance International, LLC.

(Trustee's Exhibit 78).

Williams admitted in his testimony that he had no authority to direct Moody to freeze Debtor's account, since Nixon had not been determined to be deceased, and no will had been admitted to probate.

In fact, Nixon was not dead.  Nixon was arrested in Weatherford, Texas on January 9, 2004, and was convicted on two counts of bank fraud by judgment entered on March 7, 2006, in the United States District Court for the Southern District of Texas, in Case No. 4:04CR00563-001.[4]

Very little evidence was presented as to the checks which cleared Debtor's account after Nixon had disappeared and Christiansen had instructed that all transfers required his approval.  Hopkins testified that, at the direction of Williams (although he may not have had authority to so direct), she wrote the August 29, 2003 letter to Moody directing that checks 2715, 2732, 2733, 2734, 2735, 2736, and 2737 be paid.  She did not testify as to the purpose of each of these checks.

Hopkins testified that checks paid on Debtor's account to Chase Mortgage, Sprint, Hector Garcia, Las Palmas Apartments, Retailers National Bank, Card Processing Center, and Citi Cards (two payments) were not ordinary expenses of Debtor's business.  These payments correspond to check numbers 2750, 2752, 2770,

---

[4]Nixon's conviction has been appealed to the Fifth Circuit Court of Appeals.  The appeal remains pending.

2794, 2749, 2762, 2769, and 2799, respectively, totaling
$14,750.83.  As to the two wire transfers, Hopkins testified that
she had not heard of either Hobbs Trailer & Equipment, or Blake
D. Aldridge, Inc.  Hopkins testified that, prior to Nixon's
disappearance, Nixon had written many checks without Hopkins'
knowledge.

  Reeder testified that, after Nixon disappeared, she did
not feel she had a role in the operation of Debtor's business.
She testified that she hoped to keep Debtor's business going, but
kept that hope for only a short time.  She testified that
Williams and others had told her she needed to pay bills.  She
testified at the trial on the instant adversary proceeding that
she cannot remember whether she reviewed Debtor's books and
records in determining which checks to write.  However, Reeder
acknowledged that, in a deposition she gave approximately one
month after Nixon's disappearance, she testified she had reviewed
Debtor's ledgers in order to determine which bills to pay.

  Reeder testified that she cannot remember whether she
authorized payments to be stopped on checks, whether she
presented an invoice for payment of a wire transfer to Moody, or
whether she went to Moody's branch to review the account details.
She testified that she cannot remember closing Debtor's office,
or paying Debtor's office rent.  She testified she had no idea
what bills were outstanding at the time of Nixon's disappearance,

and did not know for what bills she was writing checks.  She
testified that she met with Williams after Nixon's disappearance.
She testified that her husband, Brad Reeder, helped her determine
which checks to write.  She testified that Brad Reeder was an
employee of Debtor, for about five months before Nixon's
disappearance.  She testified that Brad Reeder had no role in
Debtor's management.  She testified that Brad Reeder's primary
role was cleaning Debtor's boats.

Reeder testified that she cannot remember whether she
talked with Nixon during September, 2003.

In the joint pretrial statement in the instant
adversary proceeding (Docket No. 35), Moody listed Brad Reeder as
a witness.  In Trustee's witness list (Docket No. 37), Trustee
listed among the witnesses "Any witness listed as a witness by
the Defendant."  Trustee did not separately list Brad Reeder as a
witness.  Neither Trustee nor Moody called Brad Reeder as a
witness.

In the instant adversary proceeding, the Chapter 7
Trustee ("Trustee") seeks avoidance of all sixty-two transfers
paid by Moody out of Debtor's account between August 29, 2003 and
September 23, 2003.  Trustee asserts that the transfers were
fraudulent conveyances under Section 548(a)(1)(A) or Section
548(a)(1)(B)(i) of the Bankruptcy Code, which may be recovered
from Moody as an immediate transferee under Section 550 of the

Bankruptcy Code.  Alternatively, Trustee states a cause of action for damages based on Moody's alleged negligence.  Trustee asserts that the total of funds debited from Debtor's account, $367,645.23 is the measure of recovery under either of the fraudulent transfer or negligence theories.  Trustee also pleads for interest, attorney fees, and costs.

Moody denied the material allegations of the complaint, and asserted as affirmative defenses the doctrine of in pari delicto, Trustee's comparative responsibility, waiver, estoppel, unclean hands, intervening negligence, failure to mitigate, unjust enrichment, quasi-estoppel, and imputed knowledge.

Charles L. Williams, an expert witness called by Trustee, testified that the prudent thing to do when Nixon had disappeared, and when it became clear that Reeder did not know anything about Debtor's business, would have been to interplead the funds into a court of competent jurisdiction, in order to allow an orderly determination of who had authority to make use of the funds.

<u>Conclusions of Law</u>

Section 548(a)(1) of the Bankruptcy Code, as it was in effect on the petition date in the instant case, provides:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within on years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A)  made such transfer or incurred such
obligation with actual intent to hinder, delay, or
defraud any entity to which the debtor was or
become, on or after the date that such transfer
was made or such obligation was incurred,
indebted; or

(B)  (i) received less than a reasonably
equivalent value in exchange for such transfer or
obligation; and

(ii)(I)   was insolvent on the date that such
transfer was made or such obligation was
incurred, or became insolvent as the result
of such transfer or obligation;

(II) was engaged in business or a
transaction, or was about to engage in
business or a transaction, for which any
property remaining with the debtor was
an unreasonably small capital; or

(III) intended to incur, or believed
that the debtor would incur, debts that
would be beyond the debtor's ability to
pay as such debts matured.

11 U.S.C. § 548(a)(1) (2003).

Trustee bears the burden of proof as to actual fraud
under Section 548(a)(1)(A).  In re Zedda, 103 F.3d 1195 (5th Cir.
1997.  Trustee bears the burden of proof as to reasonably
equivalent value under Section 548(a)(1)(B).  In re Hannover
Corp., 310 F.3d 796 (5th Cir. 2002).

Because proof of actual intent to hinder, delay or
defraud creditors may rarely be established by direct evidence,
courts may infer fraudulent intent from the circumstances
surrounding the transfer.  In re Jeffrey Bigelow Design Group,

<u>Inc.</u>, 956 F.2d 479 (4th Cir. 1992); <u>In re Triple S Restaurants,</u>
<u>Inc.</u>, 422 F.3d 405 (6th Cir. 2005); <u>Frierdich v. Mottaz</u>, 294 F.3d
864 (7th Cir. 2002); <u>In re Sherman</u>, 67 F.3d 1348 (8th Cir. 1995);
<u>In re Acequia, Inc.</u>, 34 F.3d 800 (9th Cir. 1994); <u>In re XYZ</u>
<u>Options, Inc.</u>, 154 F.3d 1262 (11th Cir. 1998).

The presence of several "badges of fraud" can establish
evidence of intent to defraud.  <u>In re Max Sugarman Funeral Home,</u>
<u>Inc.</u>, 926 F.2d 1248 (1st Cir. 1991); <u>In re Acequia, Inc.</u>, 34 F.3d
800 (9th Cir. 1994).

Texas statute sets forth factors that may be considered
to be badges of fraud: whether the transfer or obligation was to
an insider; whether the debtor retained possession or control of
the property transferred after the transfer; whether the transfer
or obligation was concealed; whether, before the transfer was
made or obligation was incurred, the debtor had been sued or
threatened with suit; whether the transfer was of substantially
all the debtor's assets; whether the debtor absconded; whether
the debtor removed or concealed assets; whether the value of the
consideration received by the debtor was reasonably equivalent to
the value of the asset transferred or the amount of the
obligation incurred; whether the debtor was insolvent or became
insolvent shortly after the transfer was made or the obligation
was incurred; whether the transfer occurred shortly before or

shortly after a substantial debt was incurred; and whether the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. Tex. Bus. & Comm. Code § 24.005.

Use of the state law factors is not controlling with respect to the question of intent to defraud under Section 548(a)(1). However, such factors are similar to those which have been considered by the courts in other jurisdictions. See e.g. Frierdich v. Mottaz, 294 F.3d 864 (7th Cir. 2002); In re Sherman, 67 F.3d 1348 (8th Cir. 1995); In re Acequia, Inc., 34 F.3d 800 (9th Cir. 1994)

In the instant case, as a threshold matter, the court must consider whose intent may be imputed to the corporation in order to consider whether such person's conduct supports an inference of an intent to defraud on the part of the corporation. Under Texas law, a corporation or other legal entity can conduct business only through natural persons. Whitney Nat. Bank v. Baker, 122 S.W.3d 204 (Tex. App.--Houston [1st Dist.] 2003, reh. overruled). Acts of a corporate agent are generally deemed to be the acts of the corporation. Latch v. Gratty, Inc., 107 S.W.3d 543 (Tex. 2003). An agency relationship requires that the agent have actual and apparent authority to act on behalf of the principal. Aquaduct, L.L.C. v. McElhenie, 116 S.W.3d 438 (Tex. App.--Houston [14th Dist.] 2003, reh. overruled). Actual

16

authority may be circumstantially proven.  <u>Bankers & Shippers</u> <u>Ins. Co. v. Ellis Green Motor Co.</u>, 102 S.W.2d 294 (Tex. Civ. App.--El Paso 1937, writ dism'd).  Apparent authority is determined by looking to the acts of the principal and ascertaining whether those acts would lead a reasonably prudent person using diligence and discretion to suppose the agent had the authority to act on behalf of the principal.  <u>Suarez v.</u> <u>Jordan</u>, 35 S.W.3d 268 (Tex. App.--Houston [14th Dist.] 2000, no writ), <u>citing</u> <u>NationsBank, N.A. v. Dilling</u>, 922 S.W.2d 950 (Tex. 1996).

Under Section 548 of the Bankruptcy Code, the intent of a corporation's president, director, and sole shareholder to defraud may be imputed to the corporation, because the individual is in a position to control disposition of the corporation's property.  <u>In re Acequia, Inc.</u>, 34 F.3d 800 (9th Cir. 1994); <u>In</u> <u>re Roco Corp.</u>, 701 F.2d 978 (1st Cir. 1983).

In the instant case, the evidence is that Nixon was the person who was the Debtor corporation's president, director, and sole shareholder.  However, at the time of the transfers out of Debtor's account, Nixon was not directly in control of disposition of the corporation's property.  After August 28, 2003, it is clear that disposition of Debtor's property required the actions of Reeder and Christiansen.  It appears likely from Reeder's testimony that such disposition also required the impetus of either Brad Reeder or Williams.

17

Reeder was a person authorized to sign on the account. Whether Reeder's authority to dispose of Debtor's assets arises from the revised signature card and corporate resolution, or derives from an agency relationship with Debtor and/or Nixon, Reeder's intent must be imputed to the corporation.

Christiansen assumed the task of determining, on behalf of Moody, whether to approve payment of the debits initiated by Reeder.  However, such decision does not amount to direct control or disposition of Debtor's property, because he did not place himself in the position of directing disposition of Debtor's account, but rather that of determining whether to permit Reeder's disposition of Debtor's account.  The court concludes that Christiansen's intent need not be imputed to Debtor.

Likewise, although it appears they exercised a power of persuasion with Reeder, neither Brad Reeder nor Williams exercised sufficient control over the disposition of Debtor's account that their intent must be imputed to Debtor.  Indeed, the letter from Moody's attorneys to Williams makes clear that Williams lacked such control.

With respect to Reeder's direct intent as to the checks she wrote and wire transfers she authorized between August 29, 2003 and September 22, 2003, the Trustee presented no evidence that any of the transfers were to insiders, or were concealed, or were to entities of which Debtor retained control, or were of

18

substantially all of Debtor's assets, or were made immediately after a substantial debt was incurred.  There is no evidence that Debtor had been threatened with suit.  The parties have stipulated that Debtor was insolvent.

The only argument raised which would support a finding of intent to defraud on Reeder's part which could be imputed to the corporation is that Reeder acted at Nixon's direction.[5] However, there is insufficient evidence on which to reach such a conclusion.  The court concludes that Trustee has not met his burden of proof with respect to intent to defraud.

The issue of whether a debtor has received reasonably equivalent value under Section 548 of the Bankruptcy Code is usually a question of fact.  In re Erlewine, 349 F.3d 205 (5th Cir. 2003), citing In re Dunham, 110 F.3d 286 (5th Cir. 1997). The court must consider whether Trustee has established, from the perspective of the transferor, that the transferor did not receive reasonably equivalent value in exchange for the transfers.  In re Hannover Corp., 310 F.3d 796 (5th Cir. 2002).

In the instant case, there is very little evidence as to the value received by Debtor for the transfers of property initiated by Nixon and/or Reeder and authorized by Christiansen. Trustee cites In re Minnesota Utility Contracting, Inc., 110 B.R.

---

[5]The court notes that this issue was raised by Moody, not by Trustee.

19

414 (D. Minn. 1990) and In re Acequia, Inc., 34 F.3d 800 (9th

Cir. 1994) for the proposition that the burden of proof shifts

from Trustee to Moody upon a showing of no value.  Both cases,

however, rely on authority in which there was a prima facie

showing of intent to defraud, not of the absence of reasonably

equivalent value.  Moreover, Trustee's argument overlooks the

Fifth Circuit's controlling decision in In re Hannover Corp., 310

F.3d 796 (5th Cir. 2002), which allocates the burden of proof as

to reasonably equivalent value to the Trustee, and allocates the

burden to the Moody only if the transferee's good faith is

asserted as an affirmative defense under Section 548(c) of the

Bankruptcy Code.  The court concludes that Trustee has not met

the burden of proof with respect to reasonably equivalent value.

Because the court has reached the conclusion that

Trustee has failed to prove a fraudulent transfer under either

Section 548(a)(1)(A) or Section 548(a)(1)(B)(i) of the Bankruptcy

Code, the court need not reach the issue of whether

Christiansen's activity with respect to the account renders Moody

an "initial transferee" within the meaning of Section 550(a)(1).

As to Trustee's cause of action for negligence,

liability in negligence is premised on duty, a breach of which

proximately causes injuries, and damages resulting from that

breach.  Whether a legal duty exists is a threshold question of

law for the court to decide from the facts surrounding the

20

occurrence in question.  If there is no duty, there cannot be negligence liability.  Thapar v. Zezulka, 994 S.W.2d 635 (Tex. 1999).

The relationship created between a depositor and a bank is created by contract.  See, e.g., LaSara Grain Co. v. First National Bank of Mercedes, 673 S.W.2d 558 (Tex. 1984).  A bank owes a duty to exercise ordinary care in paying items from the customer's account.  See e.g. American Airlines Employees Federal Credit Union v. Martin, 29 S.W.3d 86 (Tex. 2000).

Where there are competing claimants to an account, a bank has a duty to interplead.  See e.g. Cockrum v. Cal-Zona Corp., 373 S.W.2d 572 (Tex. Civ. App.--Dallas 1963).

In the instant case, Moody breached its duty of ordinary care by failing to interplead the funds in Debtor's account into a court of competent jurisdiction, when Moody knew that Nixon was missing, Reeder was writing checks on Debtor's account, and Williams had asserted entitlement to freeze the account.

The two elements of proximate cause are cause in fact (or substantial factor) and foreseeability.  IHS Cedars Treatment Centers of Desoto, Texas, Inc. v. Mason, 143 S.W.3d 794 (Tex. 2003).  Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred.  Doe v. Boys Clubs of

21

Greater Dallas, Inc., 907 S.W.2d 472 (Tex. 1995).

In the instant case, the dissipation of the funds in Debtor's account was caused in fact by Christiansen's decision, on behalf of Moody, that rather than interpleading the funds in Debtor's account, he would undertake to review checks written and wire transfers authorized by Reeder, and determine whether to allow such checks to clear. Damage to Debtor was foreseeable as to those checks which did not provide a benefit to the Debtor.

In the instant case, the court concludes that the funds sought by Trustee were paid out of Debtor's account at Moody. With respect to the checks, totaling $14,750.83, as to which Hopkins testified that they were not ordinary expenses of Debtor's business, Trustee has met the burden of proving that the estate incurred damage. With respect to the two wire transfers, in the amounts of $75,298.00 and $210,000, there is insufficient evidence for the court to conclude that Debtor did not receive the benefit of such transfers. With respect to the remainder of the checks, Trustee has failed to meet the burden of proof as to damages.

On the question of attorney fees, a person may recover reasonable attorney fees, if the claim is for rendered services, performed labor, furnished material, freight or express overcharges, lost or damaged freight or express, killed or injured stock, a sworn account, or an oral or written contract.

Tex. Civ. Prac. & Rem. Code § 38.001.  Texas law does not permit
an award of attorney fees for tort claims.  <u>Stine v. Marathon Oil
Co.</u>, 976 F.2d 254 (5th Cir. 1992).

As to the defensive matters asserted by Moody, Moody
has failed to present evidence sufficient to prove any of these
theories.

Based on the foregoing, a separate Judgment will be
entered, in Trustee's favor against Moody, for $14,750.83.

Signed at Houston, Texas on September 27, 2006.

LETITIA Z. CLARK
UNITED STATES BANKRUPTCY JUDGE